# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 9, 2002 Session

## STATE OF TENNESSEE v. CLARENCE CARNELL GASTON, MIQWON DEON LEACH, and MARIO DEANGALO THOMAS

### Direct Appeal from the Circuit Court for Obion County
### No. 9-162    William B. Acree, Jr., Judge

---

### No. W2001-02046-CCA-R3-CD  - Filed February 7, 2003

---

The defendants, Clarence Carnell Gaston, Miqwon Deon Leach, and Mario Deangalo Thomas, were convicted by an Obion County Circuit Court jury of conspiracy to commit second degree murder, second degree murder, and first degree felony murder.  Finding aggravating circumstances (3) and (7) applicable to both Leach and Thomas, and aggravating circumstances (2), (3), and (7) applicable to Gaston, the jury sentenced each defendant to life without the possibility of parole for the first degree murder convictions.  The trial court merged the second degree murder convictions into the convictions for felony murder and sentenced the defendants to eight years for the conspiracy convictions, to be served concurrently to their life sentences without possibility of parole.  All three defendants challenge the sufficiency of the convicting evidence.  Leach and Thomas each raise issues regarding the appropriateness of their life sentences without parole, and Thomas raises two additional issues of whether his trial should have been severed, and whether the verdicts of first degree felony murder and conspiracy to commit second degree murder are impermissibly inconsistent.  After a thorough review of the record and of applicable law, we affirm the judgments of conviction and the sentences imposed.  However, we remand to the trial court for entry of a corrected judgment form for Gaston's conspiracy conviction to reflect that he was found guilty by a jury.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgment

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Mike Mosier, Jackson, Tennessee, for appellant Gaston; Clifford K. McGown, Jr., Waverly, Tennessee (on appeal) and Joseph P. Atnip, District Public Defender (at trial and on appeal), for appellant Leach; and Thomas H. Strawn (at trial and on appeal) and W. Lewis Jenkins, Jr. (on appeal), Dyersburg, Tennessee, for appellant Thomas.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon and James David Kendall, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On New Year's Day 1999, the victim, Zachary Demond Achols, was shot and killed as he was standing with a group of men outside the VIP Social Club at 1212 East Main Street in Union City. Jeff Young, one of the men with whom the victim was standing, was wearing red clothing. According to eyewitnesses, a second group of men, including defendant Gaston, approached the first group and, upon Gaston's direction to shoot the one in red, opened fire, striking and killing the victim. The defendants were subsequently charged with conspiracy to commit first degree murder, first degree felony murder, and first degree premeditated murder. Although the State originally filed notices of its intention to seek the death penalty against the defendants, it subsequently withdrew those notices, substituting notices of its intention to seek life sentences without the possibility of parole. The three defendants in this appeal and a fourth codefendant, Justin Hill, who was charged with the same offenses, were tried jointly before an Obion County Circuit Court jury from March 12-17, 2001.

## State's Proof

Union City Police Officer Robby Orsborne testified that he was investigating a complaint of loud music in the East College Court area at approximately 1:40 a.m. on January 1, 1999, when he heard eight to ten gunshots from the area of Main Street and Nash, where the VIP Club was located. Officer Stan Haskins, the first officer to respond to the shooting, testified that as he drove to the scene he was flagged down by one of approximately ten African-American men who were standing in a "semi-huddled" fashion at the southwest corner of the building. When he got out of his car and approached the group, he saw the victim lying on the ground at the corner of the club. The victim was not breathing and had no discernible pulse.

Ted Alexander, the manager of a band that had played that evening at the Union City VFW, located on Main Street just east of the VIP Club, was in the parking lot behind the VFW building preparing to leave when he heard gunshots from the direction of Main Street, near the front of the club. Alexander testified that after calling 9-1-1 from his car phone, he saw two African-American men run to a maroon-colored car that was parked close to his vehicle. The taller and slimmer of the two men ran to the driver's side of the car. The second man ran to the passenger door, either retrieved a weapon from the car or reloaded one that he already had, and fired three or four shots across the front of Alexander's car at a person in a red shirt who was running in the direction of Vine Street through a vacant lot behind the buildings. The two men then got into their car and sped off. During the same period, Alexander heard more gunshots fired and saw a red car pull up and then speed away. Alexander testified that he was a retired officer of the sheriff's department and, based

on his experience with firearms, was able to determine that the twelve to fifteen rounds he heard fired that night came from two different caliber weapons.

Paul Warner testified that he was outside the Snack Shop, a business located on Main Street across from the VFW, on January 1, 1999, when he heard gunfire and looked up to see two individuals at the southwest corner of the VIP Club firing at another individual who was running from them. Warner went into the Snack Shop to telephone the police. While inside, he heard three or four more gunshots and looked out the window to see someone running through the parking lot.[1] After going back outside, Warner saw three or four men standing in the middle of Main Street. He said that he heard one of the men issuing directions, saying, "'You go this way, and you go that way, and you go this way.'" According to Warner, all of the men then "went in different directions," with one man running east down Main Street, another heading west, and a third going north between the VIP Club and the VFW.

Warner testified that he saw another individual standing at the corner of the club, looking down at the ground and nudging something with his foot. Assuming that someone had been shot, Warner went back into the shop and phoned for an ambulance. As he looked out the window, he noticed a man putting something into the trunk of a blue Caprice Classic that was parked in the Snack Shop's parking lot. Warner said that something about the man's appearance, perhaps his clothing, gave him the feeling that he was one of the two gunmen he had just seen. As he watched, the man closed the trunk and got down in the backseat of the vehicle, where he could not be seen. Another man came from across the street, hunkered down, got into the driver's seat, and started the engine. As they drove off, Warner went outside and recorded part of the vehicle's license plate number, which he subsequently provided to the police. On cross-examination, Warner testified that he did not remember what the two men in the Caprice had been wearing and acknowledged that he was not certain they had had anything to do with the shooting.

Bobby Lee Allen testified that he was walking to the VIP Club on January 1, 1999, when he saw a man "come out running across Vine Street towards E. W. James." Allen said there were two men behind the first man, and they "dropped down and started shooting at him," stopping only when their guns were empty. Because it was dark, he could not identify any of the men involved or their race.

Union City Police Sergeant Dave Davis, the supervisor on duty at the time of the shooting, testified that a "hostile crowd" of about 200 screaming people, in which several fights were breaking out, was in the parking lot and around the VIP Club when he arrived. During his initial period at the scene, when he was one of only four officers present, he and Officer Haskins were struggling to keep the victim in one spot while the crowd was trying to move him. After additional officers from the police and sheriff's departments arrived in response to his radioed calls for help, they were able to disperse the crowd and secure the scene.

---

[1]In the context of Warner's testimony, it appears as if the parking lot he is referring to is the parking lot of the Snack Shop, located on the south side of Main Street across from the VFW and the VIP Club.

Sergeant Mike George, the first investigator to arrive, testified that officers initially recovered eight bullet casings from the crime scene. They later found three more, including two that were recovered from the vicinity of the E.W. James parking lot located off Vine Street to the west of the VIP Club. A total of four bullets were recovered: two from automobiles parked at the scene, one from the corner of a building near the E.W. James parking lot, and one from the victim's body. Sergeant George testified that Warner provided the partial tag number of either "35N" or "3N5" for the blue Caprice he had seen in the Snack Shop's parking lot and, additionally, reported that there was something "funny" about the license plate. A blue Chevrolet Caprice matching Warner's description, with a personalized Tennessee plate and the tag number "735N," was later located in the parking lot of an apartment complex in Fulton, Kentucky. The vehicle was registered in the name of LaDonna Brooks.

Dr. Cynthia Gardner, the medical examiner who performed the autopsy of the victim's body, testified that the victim died as the result of a gunshot wound in which the bullet traveled in a downward path from his back into his chest, passing through his heart and severing his spinal cord and several of his major blood vessels. She said that the bullet entered the victim at the back of the base of his neck, went through his spinal cord, superior vena cava, aorta, left pulmonary artery and the right ventricle of his heart, and stopped at the space below his fourth rib. Dr. Gardner agreed that one possible scenario that would explain the path of the bullet was that the victim was shot by someone standing over him as he was lying on the ground. She found no evidence of alcohol or drugs in the victim's body. Agent Robert Daniel Royce, a firearms examiner with the Tennessee Bureau of Investigation, testified that the bullet from the victim's body came from a .380 automatic weapon. Seven of the shell casings recovered from the scene came from a .380 automatic, while the remaining three shell casings came from a .9 millimeter Luger.

Jeff Young testified that he arrived at the VIP Club around midnight on New Year's Eve. He saw and spoke with the victim, as well as with Justin Hill and a man named Daman Biffle. In addition to these men, he said that he saw each of the defendants in the club. At some point, he, Jarvis Jones, Kim ("Kemp") Brown, Clarence Jones, and the victim decided to go outside the club, to the corner between the VIP and the VFW, to smoke marijuana. However, before they could light their "joint," Gaston came around the side with a group of men. Young described what occurred:

> Well, it started when [Gaston] came to the side, and he was on the other side of the cars that was there on the side of us, and he was saying, "Yeah, that's him, that's him in the red. Shoot, shoot, shoot. Fire, fire, fire." So, then, we all looked back, and that's when we seen the rest of 'em, like, in the front of us, like, looking to the right, and that's when I seen [Leach]. He was – well, we call it jackin' the gun off. And that's when I started to run, and the rest of us ran.

Young testified that he never looked back to see how many people were shooting, but Leach, who had an automatic weapon, was the only one he saw with a gun. However, he knew there was more than one gun because he heard several shots fired, including different rounds fired at the same

time. He said that he escaped by running to a nearby house. As he was behind the house, he saw one of Gaston's cars, a burgundy Buick Park Avenue, traveling up Vine Street in the direction of the club. Young acknowledged that he was serving time for two drug convictions and was facing charges on two additional offenses, but said that he had not been promised anything in exchange for his testimony.

Young testified on cross-examination that he had never had any trouble with Gaston, and he was not aware of any grudge Gaston may have held against him. He said that Gaston was about five to ten feet from him when he first saw him outside the club, but admitted that he may have said at the preliminary hearing that he was thirty to forty feet away. He testified that there were at least five people with Gaston, one of whom was Daman Biffle, and that he did not see Gaston with a gun. He admitted that he went home to Jackson, Tennessee, after the crime and did not talk to the police until January 6, 1999, when he telephoned a woman named Brenda Brown at a time when Captain Barfield of the Union City Police was present at her home. He "guess[ed]" it was true he was originally a suspect in the case, admitted that he had not voluntarily gone to the police, and acknowledged that the first time he talked with the police about the case, other than during his January 6 telephone conversation with Captain Barfield, was after he was arrested. He conceded that Thomas and Gaston were the only two defendants he named during his initial telephone conversation with Barfield; the other men he only described. He acknowledged having described one of the men as cross-eyed and said that Leach was that man. He never saw Thomas with a gun. On redirect, he testified that he had been wearing red on the night of the shooting and that he had identified Leach from photographs shown to him by the police.

Jarvis Jones testified that he went to the VIP Club on New Year's Eve with Jeff Young and "Kemp." After meeting the victim inside the club, the four of them decided to go outside to smoke marijuana.[2] Jones described what occurred when they went outside:

> A.    Stepped outside, and no sooner did we get to the corner of the club, some guys come out. I seen Mr. Gaston, he came out, and he directed 'em to us, like tellin' 'em to go ahead and shoot us, or whatever.
>
> Q.    Do you recall what you heard Mr. Gaston say?
>
> A.    He said, "Red, red, let it go right there."

Immediately after Gaston's command, Jones saw Leach pull out a chrome pistol. At sight of the pistol, Jones turned to run between the VIP building and the VFW but fell to the ground when one of his companions stepped on his heel. He said that he "sat there for a minute" and "played dead." He then heard Gaston say, "Yeah, you got him, you got him" and saw, out of the corner of his eye, Thomas approaching armed with a black automatic gun. When he heard Thomas say,

---

[2] Jones had no memory of Clarence Jones having been with the group that went outside to smoke marijuana.

"Where he at, where he at?" he jumped up and ran behind the club across the empty E.W. James parking lot to the Stephens Motel, hearing gunshots behind him as he did so. Jones made positive courtroom identifications of Gaston, Leach, and Thomas and testified that he heard a total of more than ten gunshots.

On cross-examination, he testified that Gaston was alone when he first saw him come around some cars outside the club. He heard Gaston say, "Red, red. There them niggers go right there." He assumed the other men, who came around within "[s]econds" of when he first saw Gaston, came from the front of the club, "the same place [Gaston] come from." He went on to testify, however, that he saw Thomas come from around the corner and that Leach was in the street. He said that he ran when he saw Leach bring out a large, chrome pistol and that he fell to the ground after running approximately one-third of the distance from the front corner of the building to the back. After falling to the ground, Jones crawled between some cars and lay still, pretending to be dead. He first recognized Leach after he had fallen to the ground and was lying between the cars. He acknowledged having told investigators that Leach had been wearing a hooded jacket and that he had been unable to see the top portion of his face.

Jones provided contradictory testimony about whether he had looked underneath or around the cars to see Thomas with the gun. Nonetheless, he was confident he had seen Thomas and that he had had a gun. He acknowledged that it was dark, and there were no lights in the area where he was lying. He also acknowledged that he had only seen Thomas two or three times prior to the shooting. Jones said he went home to Jackson, Tennessee, the day after the shooting and later went to Mammoth Cave, Kentucky, to participate in a Job Corps program. He did not talk to the police until they came to see him at Mammoth Cave. Jones acknowledged he and Jeff Young had smoked marijuana and drunk alcohol earlier in the evening, and they had discussed the shooting by telephone before he first talked to the police.

Nicholas Hansard, who said he was originally from Rockford, Illinois, testified that he first came to Union City in August 1998. At that time, several of his friends, including Miqwon Leach, Mario Thomas, Justin Hill, and Daman Biffle, had already been in the area for about a month. Hansard said that approximately three weeks before the shooting, Leach told him that he had been robbed the day before by Red Boxley and Jeff Young. On New Year's Eve 1998, he heard Thomas, Hill, and Leach discussing Young, saying that if they saw him at the club they were going to "get him." Hansard said that he went to the club later that night with Thomas and Thomas' girlfriend, Toya, and saw Gaston inside the club.

Hansard testified that he was dancing with a woman named Sonya Polk when Leach motioned him over and told him that it was about to "go down," that they were about to get Young. He said that he followed "'em" outside, where he saw that both Leach and Gaston had guns. Next, Gaston, who had a "very mean" look on his face, pointed and said, "Get 'em." Hansard said that he ran and hid behind a car and then heard gunshots. When the gunshots stopped for a moment, he peeked around the car and saw Leach and Hill standing at the corner of the building, with Leach kicking the victim who was lying on the ground. He did not see Gaston at that point. He next saw

-6-

Leach and Hill run across Main Street to a parking lot. He never saw Hill with a gun and did not remember having seen Thomas outside the club.

Hansard testified that he had a conversation on January 2, 1999,[3] with Leach and Gaston during which Leach said he had shot the victim, and Gaston said he had chased and fired at Jeff Young by the E.W. James parking lot. Hansard admitted that he had been indicted for the crimes and had agreed to plead guilty to conspiracy to commit homicide, with the degree of homicide to be set after the jury returned their verdicts in the instant case. He acknowledged that the sentence he would receive for his conviction was to be served concurrently to the sentence he was currently serving for a federal drug conviction. Hansard conceded he had, in the past, given several different accounts in statements to law enforcement officials, including that he had not been at the club, that he had been present but had stayed inside, and that he had gone to the door but had gone back inside before the shooting started. He said, however, that he had also previously given the same account that he was providing at trial and that his trial testimony was the truth.

Hansard acknowledged on cross-examination that Hill, Leach, and Thomas had merely discussed "getting" Young, which, he claimed, he had assumed meant roughing him up; no mention had been made of shooting him. Gaston was not present during this conversation and, to his knowledge, was also not present when Young allegedly robbed Leach. Hansard estimated that approximately ten or fifteen people were outside the club at the time of the shooting. He said that he did not see either Hill or Leach get into a blue Chevrolet and never saw Hill with a gun. He did not see Gaston, Leach, or Thomas in the street.

Demecca Holder testified that she went to the VIP Social Club early on New Year's Day 1999 with LaFaye Johnson and Shyretha Stevens. When they arrived at the club, she and Johnson went inside while Stevens walked in the opposite direction. Holder said that as they went in, Hill, Thomas, Hansard, Gaston, and a man named Kolliepaye passed them going out. Shortly afterwards, Shyretha Stevens came inside the club yelling that there had been a shooting. Holder admitted on cross-examination that she had said in a statement to police that approximately twenty to thirty minutes elapsed from the time she saw the men leave the club until Stevens came inside to report the shooting.

LaFaye Johnson testified that it was approximately 1:00 a.m. when she, Holder, Stevens, and several friends arrived at the VIP Club. Stevens did not go inside but instead stayed outside to talk with someone. Johnson said that the victim was part of a crowd of people that passed her, heading outside, as she was entering the club. She also saw Gaston, Thomas, Hansard, and Leach leaving the club as she went in. She said that she and her companions had just made it to the pay booth when they heard four or five shots, and Stevens, who was crying, came in saying that "they were shooting."

---

[3]Hansard testified that this conversation occurred the day after Gaston's brother was shot and killed. He confirmed that the second shooting, which resulted in the death of Sherman Gaston, occurred on the evening of New Year's Day.

LaDonna Brooks, the registered owner of the blue Chevrolet Caprice located in the parking lot of the Fulton, Kentucky, apartment complex, testified that Justin Hill gave her the money to buy the car and that he had her register it in her name. She said Hill kept the car and drove it; she never used the vehicle.

Sonya Polk testified that she was dancing with Nick Hansard at the VIP Club early on New Year's Day when Leach called him to the side and spoke with him for a moment. She said that the two men then left the club together. Polk testified on cross-examination that she saw Gaston and his girlfriend, Raschelle, leave the club with Thomas and his girlfriend, LaToya, going out the front door. On redirect, she testified that it was after Gaston and Thomas had left the club that she heard gunshots.

Sergeant Mike George, recalled by the State, testified that the front parking lot of the VIP Club was well-lit, with floodlights all across the top of the building. In addition to those lights, there was a security light on the side of the VFW in between the buildings, as well as a security light on a pole at the rear of the VFW. George said that the visibility in the area was generally good, and he had not needed a flashlight to walk between the buildings.

## Defense Proof

Gaston's first witness, VIP Club owner Harold Hensley, testified that every patron of his club was scanned by a metal detector, designed to detect guns or knives, before entering the establishment. He said that he saw Gaston leaving the club on January 1, 1999, with his girlfriend after the club had closed but did not see Gaston leave at any other time. On cross-examination, Hensley initially testified that he had personally scanned Gaston, Thomas, Leach, and Hill for weapons as they entered the club. He later changed his testimony, stating that Gaston was the only one he could remember personally scanning and that one of his employees may have scanned the others. He had no knowledge of what weapons may have been outside the club. He testified that Gaston and Leach had just left the club when someone told him that there had been a shooting outside. Hensley acknowledged that Gaston's mother was his girlfriend, as well as a long-term employee.

Raschelle Brown testified she had been Gaston's girlfriend for about a year at the time the shooting occurred. She and Gaston arrived at the club before midnight and left at about 1:00 a.m., after someone came into the club yelling that someone had been shot. When they got outside, they saw a crowd of people gathered around someone lying on the ground. She did not see Gaston threaten anyone at the club, or leave the club at any time before his departure with her. On cross-examination, she testified that both she and Gaston were searched with a metal detector before entering the club, but Mr. Hensley was not the one who conducted the search.

Thomas' girlfriend, Catoya Hendrix, testified that she and Thomas arrived at the club at approximately 11:15 p.m. on New Year's Eve and stayed about forty-five minutes before driving to her apartment in Hickman, Kentucky. At the time they left, she was unaware of any sort of

altercation having taken place at the club. To question her about the shooting, the police later came to the bank where she worked. Because she was afraid and did not want to get involved, Hendrix lied in her initial statement, telling the police that she did not know Thomas. She acknowledged that she had discussed the case with Thomas.

Leach and Hill rested their cases without presenting any proof. After deliberating, the jury found Leach, Gaston, and Thomas guilty of conspiracy to commit second degree murder, first degree felony murder, and second degree murder. Hill was found not guilty in counts one and two but guilty of facilitation of second degree murder in count three. Finding three aggravating circumstances applicable to Gaston and two each applicable to Thomas and Leach, the jury sentenced each defendant to life without the possibility of parole for the first degree murder convictions. Following the denial of their motions for new trial, Gaston, Thomas, and Leach filed timely appeals to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

All three defendants challenge the sufficiency of the evidence in support of their convictions. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a

defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendants were convicted of conspiracy to commit second degree murder, first degree felony murder, and second degree murder, with the trial court merging the second degree murder convictions into the convictions for felony murder. Tennessee Code Annotated section 39-12-103(a) provides that criminal conspiracy is committed

> if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Additionally, an overt act in furtherance of the conspiracy must be committed by one of the coconspirators. Tenn. Code Ann. § 39-12-103(d) (1997). Second degree murder is defined as "[a] knowing killing of another." Id. § 39-13-210(a) (1997). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Id. § 39-11-106(20) (1997). Felony murder, for the purposes of this case, is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder," id. § 39-13-202(a)(2) (1997), with first degree murder defined as "[a] premeditated and intentional killing of another." Id. § 39-13-201(a)(1) (1997). The State argued at trial that each of the defendants was responsible for the actions of the other based on a theory of criminal responsibility. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2) (1997).

### A. Defendant Gaston

As support for his contention that the evidence was insufficient to support his convictions, Gaston primarily relies on the State's failure to show his motive to commit the offenses. He points out that no proof was presented that he was present during the conversation in which his codefendants discussed "getting" Jeff Young, or that he was aware of Young's alleged robbery of Leach. Although conceding that the State was not required to prove motive, Gaston argues that its failure to do so, combined with the poor character of many of the State's witnesses and the various conflicts in their testimony, creates sufficient reasonable doubt to overturn his convictions. The State asserts that motive is not an element of the offenses and contends that the evidence was more than sufficient to support Gaston's convictions. We agree with the State.

-10-

The State was not required to show Gaston's motive for the crime or to provide direct proof of his participation in an agreement with his codefendants to kill Jeff Young, in order to gain its convictions in this case. The existence of a conspiracy may be shown "by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise." Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). The jury heard testimony from Nicholas Hansard that Leach, Hill, and Thomas had discussed "getting" Jeff Young if they saw him at the club, presumably as retaliation for his alleged robbery of Leach. Three eyewitnesses to the shooting, Hansard, Young, and Jarvis Jones, testified that the shooting began when Gaston directed the men in his group to the group of men in which Young was standing. Although each witness recounted a different version of the words Gaston used, with Hansard testifying he said, "Get 'em," Jones testifying he said, "Red, red. There them niggers go right there," and Young testifying he said, "Yeah, that's him, that's him in the red. Shoot, shoot, shoot. Fire, fire, fire," all the witnesses agreed that it was Gaston who directed the men to Young, or to his group, and gave the command to shoot. In addition, Jones testified that he heard Gaston tell Thomas, "Yeah, you got him, you got him," as he was lying still between two cars, pretending to be dead. Hansard testified that Gaston was armed and that he told him the day after the shooting that he had chased and shot at Jeff Young. Four additional witnesses, Demecca Holder, LaFaye Johnson, Sonya Polk, and Harold Hensley, saw Gaston going out of the club before the shooting began. From this evidence, the jury could have reasonably inferred that Gaston formed an agreement with his codefendants to kill Young and that he acted on that agreement, leading his codefendants to Young and Young's companions where they stood outside the club and directing them to shoot.

Gaston argues that Young, Hansard, and Jones were not credible witnesses and that their testimony therefore should not have been accredited. In support, he cites the criminal background of Young and Hansard, Hansard's involvement in the crime, and the failure of Young and Jones to voluntarily come forward with their stories after the shooting, as well as the various conflicts in their testimony. However, the credibility of witnesses and the resolution of conflicts in the testimony are both matters to be resolved by the jury, as the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). By finding Gaston guilty of conspiracy to commit second degree murder, first degree felony murder, and second degree murder, the jury obviously chose to accredit the testimony of these witnesses and to resolve any conflicts in the evidence in the State's favor. This was its prerogative. We, therefore, conclude that the evidence was sufficient as a matter of law to support Gaston's convictions.

### B. Defendant Leach

Leach makes no argument in support of his contention that the evidence was insufficient to support his convictions, instead referring this court to the entire record in the case. The State correctly notes that a defendant who fails to make an argument on an issue or appropriate citations to the record waives the issue on appellate review. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

However, regardless of the waiver, we conclude that the record contains ample evidence to support the jury's guilty verdicts with respect to Leach. Hansard testified that Leach told him approximately three weeks before the shooting that he had been robbed by Jeff Young. On New Year's Eve, Hansard heard Leach, Thomas, and Hill discussing plans to get Young if they ran into him at the club. When Hansard was at the club later that evening, Leach called him away from dancing, told him that it was about to "go down," and led him outside. Hansard said that he saw a pistol in Leach's hand, and, when the initial firing stopped and he peeked from his hiding place, he saw Leach standing over the victim's body, kicking him with his foot. The next day, Leach told him that he had shot the victim.

The woman with whom Hansard had been dancing, Sonya Polk, confirmed that Leach called Hansard away during the middle of a dance, and the two men then left the club. After the men left, she heard gunshots. Jeff Young and Jarvis Jones, who were both standing with the victim before the shooting began, testified that they saw Leach with a pistol, with Young adding the additional detail of having seen Leach "jackin' the gun off." In our view, this evidence was more than sufficient to sustain Leach's convictions for first degree felony murder and conspiracy to commit second degree murder.

## C. Defendant Thomas

Thomas concedes there is some evidence of his guilt, most notably, the testimony of Nicholas Hansard and Jarvis Jones, but contends that the evidence is insufficient as a matter of law to support the guilty verdicts of the jury. In support of his position, Thomas cites the following: Jones's identification of Thomas as a shooter occurred while he was under the influence of alcohol and marijuana, in a dimly lit location and looking out of the corner of his eye from underneath a car; Hansard testified that the conversation Leach, Hill, and Thomas had about "getting" Young did not include any talk of shooting or killing anyone; neither Hansard nor Young reported seeing Thomas with a gun and Hansard did not remember seeing him outside the club at the time of the shooting; and Demecca Holder testified she had reported to police that she heard gunshots some twenty to thirty minutes after she saw Thomas leave the club. Thomas additionally cites the testimony of his girlfriend, Catoya Hendrix, that he left the club with her before the shooting. The State contends that the evidence was sufficient to sustain the jury's verdicts. We agree with the State.

Viewed in the light most favorable to the State, the evidence was sufficient to support the jury's findings that Thomas was guilty beyond a reasonable doubt of conspiracy to commit second degree murder, second degree murder, and first degree felony murder. Hansard's testimony placed Thomas in the group he heard discussing "getting" Jeff Young. Although Hansard testified that no one used the words kill or shoot, a rational trier of fact could reasonably conclude, based on the circumstances surrounding the subsequent shooting and killing of the victim, that the agreement was to kill Jeff Young. Both Demecca Holder and LaFaye Johnson saw Thomas exiting the club before the shooting, in the company of at least some of his codefendants. According to Johnson's testimony, the gunshots occurred almost immediately after Thomas and his companions had gone outside the club. Finally, Jarvis Jones's testimony established that Thomas was an active participant

in the shooting itself. After the initial burst of gunfire, Jones saw Thomas armed with a gun approaching the position in which he was lying, heard Gaston tell Thomas that he had gotten someone, and heard Thomas ask, "Where he at, where he at?" Jones then jumped up and fled, hearing gunshots behind him.

Thomas questions the reliability of Jones's identification of him as a shooter, pointing to testimony that Jones had been drinking and smoking marijuana earlier in the evening, had seen Thomas on only two or three prior occasions, and had viewed Thomas out of the corner of his eye in a dimly lit location, looking either under or around a car. However, Jones maintained in the face of a strong cross-examination that he was sure he had seen Thomas with a gun. Furthermore, although Jones conceded on cross-examination that it was dark in the area where he was lying, Sergeant George testified that the front parking area of the club was well-lit and that there was adequate light for him to walk between the buildings without a flashlight. Thus, there was evidence from which the jury reasonably could have accredited Jones's identification of Thomas as one of the gunmen. We, therefore, conclude, that the evidence was sufficient to sustain Thomas' convictions for first degree felony murder and conspiracy to commit second degree murder.

## II. Trial Court's Failure to Sever Thomas' Trial

Thomas contends that the trial court's denial of his motion for severance prejudiced him because: (1) the proof against Gaston and Leach was stronger than the proof against him, creating a risk that the jury would find him guilty by association based on the evidence against his codefendants; and (2) he was denied the testimony of Justin Hill, which could have exonerated him. The State responds that the trial court did not abuse its discretion in denying the severance.

Rule 14(c)(2)(i) of the Tennessee Rules of Criminal Procedure provides that the trial court shall grant a severance of defendants before trial if "it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Whether to grant a severance, however, lies within the sound discretion of the trial court. State v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981)). A trial court will not be found to have abused its discretion in denying a severance unless the record clearly shows that the defendant was so prejudiced by the joint trial that the granting of a severance became a judicial duty. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

Our review reveals no abuse of discretion by the trial court in denying Thomas' motion for severance. Thomas argued at the October 6, 2000, hearing on his motion to sever that he would be prejudiced by a joint trial because the evidence was weaker against him than against Gaston and Leach; a joint trial would deprive him of the testimony of his codefendants; and there was a possibility that he and his codefendants would present antagonistic defenses. It is clear from the trial transcript that no antagonistic defenses were presented, and ample evidence was presented to show Thomas' guilt. The fact that damaging proof is presented against one defendant does not by itself entitle a codefendant to a severance. Meeks, 867 S.W.2d at 369. Instead, "[w]hat must be shown

is that a defendant was clearly prejudiced by the evidence regarding the codefendant to the point that it became a judicial duty to grant a severance." Id. (citing Burton, 751 S.W.2d at 447). There is no evidence in the record from which to conclude that the jury found Thomas guilty merely by virtue of his association with Gaston and Leach.[4] We note that Justin Hill, who was also associated with Gaston and Leach, was found guilty of a lesser offense on one count and not guilty of the other two counts of the indictment. Thus, the jury was obviously capable of distinguishing between the different evidence presented against each defendant in the case.

Thomas also argues that his joint trial deprived him of the testimony of his codefendant Hill. However, there is nothing in the record to demonstrate that Hill would have been willing to testify on behalf of Thomas, or that, had he done so, he would have provided exculpatory testimony. At the hearing on his motion for a severance, Thomas stated merely that each of his codefendants would be able to offer testimony to establish that he neither conspired with them nor participated in any way in the crimes, without explaining what specific testimony they would offer on his behalf. In his notice of alibi, which he cites in support of his claim that Hill could have provided exculpatory evidence, Thomas states that he was at an apartment in Hickman, Kentucky, at the time of the crimes and lists Justin Hill and Nicholas Hansard as two potential witnesses in support of that alibi. However, because trial witnesses testified that Hill was present at the time of the shooting, it is difficult to conceive how Hill's testimony could have helped Thomas with his alibi. We conclude, therefore, that the trial court did not abuse its discretion in denying Thomas' motion for a severance.

## III. Inconsistent Verdicts

Thomas next contends that the jury's verdicts are impermissibly inconsistent. He asserts that by finding him guilty of the lesser offenses of conspiracy to commit second degree murder and second degree murder, the jury necessarily rejected the State's theory that he was attempting to commit a first degree premeditated murder at the time the victim was killed, thereby invalidating his conviction for felony murder. However, as Thomas recognizes, our supreme court has long held that consistency between verdicts on separate counts of an indictment is not required in Tennessee. In Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973), our supreme court, adopting the rationale of the United States Supreme Court in Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L. Ed. 356 (1932), concluded that consistency between verdicts is not required to sustain a conviction. The court wrote:

---

[4]In a reply brief, Thomas asserts that the State made factual errors in its brief regarding Young's testimony and argues that the State's alleged error demonstrates why he should have been granted a separate trial. Thomas contends the following assertion in the State's brief is inaccurate: "Mr. Young testified that when he was outside with the victim, the defendants, including Thomas, came outside and confronted the group he was with." Thomas asserts that Young never identified him as one of the men in the group outside the club. A close reading of the trial transcript, however, reveals that he did. Young testified on cross-examination that during his January 6 telephone conversation with Captain Barfield, he identified Thomas and Gaston as two of the men in the group which confronted the group in which he was standing.

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

Wiggins, 498 S.W.2d at 93-94.

Notwithstanding the holding in Wiggins, Thomas argues that the inconsistent verdicts in his case violate fundamental principles of due process, and urges this court to reexamine what he terms the "anachronism" of allowing "frank irrationality of inconsistent verdicts" to stand. Thomas' argument amounts, in effect, to a request that this court overturn our supreme court's holding in Wiggins. It is not the province of this court, however, to overturn decisions of our supreme court. We have previously determined that there was sufficient evidence in the record to sustain Thomas' felony murder conviction. Under Wiggins, the jury's findings that Thomas was guilty of second degree murder and conspiracy to commit second degree murder did not preclude its finding that he was also guilty of first degree felony murder. This issue, therefore, is without merit.

### IV. Life Sentences Without the Possibility of Parole

Thomas and Leach both challenge the appropriateness of their life sentences without the possibility of parole. Leach contends that a review of the record demonstrates that his life sentence without the possibility of parole is excessive, given the facts of the case and his personal history. Leach additionally contends that, since the State withdrew its notice of intent to seek the death penalty, his sentence for felony murder should have been determined by the trial court and not the jury. Thomas contends that the record contains insufficient evidence to support either of the aggravating circumstances found applicable by the jury.

### A. Sentencing By Jury Instead of Trial Court

As an initial matter, we first address Leach's contention that the State's withdrawal of its notice of intent to seek the death penalty meant that his sentence should have been set by the trial court and not the jury. In support of this contention, Leach cites Tennessee Code Annotated section 40-35-203, enacted in 1989, which provides that sentences in felony and misdemeanor cases shall be imposed by the trial court, except as provided in subsection (c). Id. § 40-35-203(a) (1997). Subsection (c) states: "If a capital offense is charged and the jury returns a verdict where death is a possibility, the jury shall fix the punishment in a separate sentencing hearing as otherwise provided by law, unless the jury is waived as to punishment." Id. § 40-35-203(c). Although Leach cites the statute without providing any argument, we surmise that it is the "where death is a possibility"

-15-

language of subsection (c) which leads him to assert that his sentence for felony murder should have been set by the trial court because the State was not seeking the death penalty for the crime.

However, Tennessee Code Annotated section 39-13-207, enacted in 1993, specifically governs sentencing in first degree murder cases where the State does not seek the death penalty. This statute, entitled "Sentencing where death penalty is not sought," provides in pertinent part:

> (a)  In any first degree murder case in which the state does not seek the death penalty but is seeking imprisonment for life without possibility of parole as the maximum punishment, should the jury find the defendant guilty of first degree murder, *the jury shall fix the punishment in a separate sentencing proceeding to determine whether the defendant shall be sentenced to imprisonment for life without possibility of parole or imprisonment for life.* Such sentencing proceeding shall be conducted in accordance with the provisions of § 39-13-204, excluding references to the death penalty.
>
> . . . .
>
> (c)  If the jury unanimously determines that the state has proven beyond a reasonable doubt one (1) or more of the statutory aggravating circumstances set forth in § 39-13-204 (i), the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or imprisonment for life.
>
> (d)  The jury shall be instructed that, in imposing sentence, it shall weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances.

Tenn. Code Ann. § 39-13-207(a), (c), (d) (1997) (emphasis added). "Because first degree murder is punished by either life imprisonment or death, first degree murder is not punished according to the sentencing structure provided in § 40-35-105 et seq." Tenn. Code. Ann. § 39-11-117 (1997), Sentencing Commission Cmts. This issue, therefore, is without merit.

### B.  Leach's Life Sentence Without Possibility of Parole

Leach also contends that a review of the record demonstrates that his life sentence without the possibility of parole is excessive, given the facts of his case and his personal background. However, he provides neither citations to the record nor argument in support of this claim. This issue, therefore, is waived. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

Regardless of the waiver, we conclude that Leach's life sentence without parole was appropriate under the facts and circumstances of this case.

At the sentencing phase of the trial, the State submitted the following statutory aggravating circumstances as applicable to all three defendants:

> The defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder;
>
> The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-204(i)(3), (7) (1997). The only evidence Leach offered in mitigation was the testimony of his mother, Gloria Jean Leach, who testified that Leach was a good, respectful son who participated in church activities as a child and volunteered to perform services for various members of his community. To illustrate his helpful nature, Ms. Leach testified that Leach used to cut neighborhood children's hair and took elderly residents to the grocery store.

At the conclusion of the sentencing hearing, the jury found both statutory aggravating circumstances applicable to Leach and sentenced him to life without the possibility of parole. Tennessee Code Annotated section 39-13-207(g) provides that a sentence of imprisonment for life without the possibility of parole "shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." When considering whether an aggravating circumstance was proved, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. See State v. Nesbit, 978 S.W.2d 872, 887 (Tenn. 1998); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994).

Based on our review, we conclude that the aggravating circumstances found by the jury were proved beyond a reasonable doubt and that the jury did not impose the sentences in this case arbitrarily. The evidence at trial established that the victim was standing in a group of at least three other men at the time he was shot and killed, and multiple gunshots were fired in his direction. Aggravating circumstance (3), which "contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based," State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984), "most often has been applied where a defendant fires

-17-

multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present," State v. Burns, 979 S.W.2d 276, 280 (Tenn. 1998). Thus, aggravating circumstance (3) was clearly appropriate in this case.

The State also proved aggravating circumstance (7) beyond a reasonable doubt. Our supreme court has held that this circumstance, the felony murder aggravator, "can be used to enhance a sentence to life without the possibility of parole when the defendant is convicted of felony murder." State v. Butler, 980 S.W.2d 359, 362 (Tenn. 1998). For the felony murder aggravator to be applied to Leach, the State had to show beyond a reasonable doubt that the victim's murder was "knowingly committed, solicited, directed, or aided by [Leach], while [he] had a substantial role in . . . attempting to commit . . . any first degree murder." Tenn. Code Ann. § 39-13-204(i)(7) (1997). The State's theory in this case, which was supported by the proof at trial, was that the victim was shot and killed during the defendants' attempt to commit a first degree premeditated murder of Jeff Young. In light of the two aggravating circumstances that were proved and the relatively weak evidence Leach presented in mitigation, we conclude that the evidence supports Leach's sentence of life without the possibility of parole for the felony murder conviction.

### C. Thomas' Life Sentence Without Possibility of Parole

The jury based Thomas' life sentence without the possibility of parole on the same two aggravating circumstances it found applicable in Leach's case: the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder; and the murder was knowingly committed during the defendant's substantial role in attempting to commit a first degree premeditated murder. Thomas contends that the jury's sentence was arbitrary because the evidence does not support the existence of the aggravating circumstances beyond a reasonable doubt, and the jury failed to consider his evidence in mitigation. We respectfully disagree.

First, as was the case with Leach, the evidence at trial established that at least two other individuals were placed at great risk of harm by the multiple gunshots fired that night. Thus, the evidence supports aggravating circumstance (3) beyond a reasonable doubt. Second, Thomas, like Leach, was convicted of felony murder under the State's theory that the victim was killed during Thomas' attempt to commit a first degree premeditated murder of Jeff Young. Therefore, aggravating circumstance (7) applies. Moreover, there is no evidence to support Thomas' contention that the jury "irrationally refused to credit the mitigating evidence that he presented," thereby leading to an "excessive and arbitrary sentence." Thomas' mitigating evidence consisted of testimony from his current girlfriend regarding his close relationship with his four children by three different mothers; a combination of testimony from an investigator hired by defense counsel and documentary evidence showing that Thomas' mother was only fourteen years old when he was born; that Thomas' father had numerous criminal convictions, had suffered from clinical depression, and scored in the borderline range on intelligence tests; that Thomas had a juvenile criminal history; and that a large amount of criminal activity occurred in the Memphis neighborhood where Thomas was reared. However, evidence showing that Thomas grew up in a crime-ridden neighborhood, had a difficult

childhood, or lacked an involved father is not sufficient for us to conclude that the jury acted in an arbitrary fashion in sentencing Thomas to life without the possibility of parole based on the two aggravating circumstances applicable in his case.

## CONCLUSION

Having thoroughly reviewed the record and applicable law, we conclude that the evidence was sufficient to support the defendants' convictions and that the jury properly sentenced the defendants to life without the possibility of parole for the first degree murder convictions. We further conclude that jury's verdicts were not impermissibly inconsistent and that the trial court did not abuse its discretion in denying Thomas' motion to sever. Accordingly, we affirm the judgments of conviction and the sentences imposed. However, we remand to the trial court for entry of a corrected judgment form to reflect that Gaston's conspiracy conviction resulted from a guilty verdict by a jury.

_____

ALAN E. GLENN, JUDGE